Titone, J.
(dissenting). This case concerns a horrible and brutal crime that captured and held the public’s attention for more than a year. It also involves the conduct of police officers and an Assistant District Attorney who obtained a confession from a 15-year-old boy by keeping him in isolation from the three concerned adults who came to the police station to help him. Because the officers’ actions represented a deliberate effort to keep him away from all responsible individuals who might have offered counsel or assistance, I would reject the holdings of the courts below and hold instead that the resulting confession must be suppressed.
Although the majority briefly sketches the circumstances surrounding defendant’s detention and interrogation, they are sufficiently important to bear further elucidation. At a little after 10:30 p.m. on the day after the highly publicized crime occurred, Detective Taglioni and three other detectives went to defendant’s home and "asked” him and his two companions to come to the police station for questioning. Defendant "voluntarily” accompanied the detectives, while his sister called an aunt who lived near the police station, Marilyn Hatcher, and asked her to go to defendant’s aid. Hatcher left for the *59 police station with her fiancé almost immediately, arriving at approximately 11:10 p.m. By that time, defendant had arrived at the police station and had been taken to the Sex Crimes Office for questioning.
A Detective McKenna read defendant the Miranda warnings and obtained a waiver of his rights just as Hatcher reached the police station and told an officer that she wanted to see her nephew. After being asked to wait for a few minutes, Hatcher was told by Detective Taglioni that defendant was currently being questioned, that she would not be permitted to see him because she was neither a parent nor a guardian and, finally, that defendant would not even be given the information that "some of his family was there.”
Approximately 15 minutes later, David Nocenti, a United States Attorney who happened to be defendant’s "Big Brother”, arrived. Having learned from Hatcher that she had been prevented from seeing defendant, Nocenti approached the desk officer and informed him that he was a friend of defendant’s family as well as an attorney. Nocenti was asked to wait while Assistant District Attorney Fairstein, the head of the Sex Crimes Prosecution Unit, was informed of his presence. Fairstein conferred with one of the detectives who was involved in defendant’s questioning and ascertained that defendant had already made a number of inculpatory statements. Fairstein did not suggest that the questioning should be suspended because of Nocenti’s presence. Instead, she approached Nocenti, told him that he had no right to be at the precinct and questioned his ethics as an attorney. Significantly, Nocenti had made it clear that he was there not in his capacity as an attorney, but rather was there as a friend of the family who wanted to aid defendant. At 11:40 p.m., Fair-stein told Nocenti that he could not see defendant and that he would have to leave the premises because he was neither an immediate family member nor an attorney representing the suspect. As in the case of Marilyn Hatcher, defendant was not informed that Nocenti had come to the precinct to see him.
Within minutes, defendant’s mother arrived and encountered Hatcher and Nocenti, who were waiting outside the precinct. The entire group then reentered the precinct and informed the desk officer that defendant’s mother was now there. After waiting for a few minutes, Fairstein and another Assistant District Attorney spoke with defendant’s mother and told her that she would be permitted to see him after the questioning had been completed.
*60 After conferring with Nocenti outside, defendant’s mother went back inside, this time demanding that she be permitted to see her son immediately. It was then that she revealed for the first time that defendant was 15, not 16 as the authorities had previously been led to believe. Apparently caught off guard, Fairstein bickered with defendant’s mother and Detective Taglioni for a few minutes before deciding to call a halt to the interrogation. Even then, the questioning did not immediately stop. Instead, it merely shifted to the subject of defendant’s age and how it had been misrepresented on his identification card.
In all, defendant was questioned for an hour and a half before the interrogation was terminated. During that entire period, unbeknownst to him, there were related and/or concerned adults who were present and could have provided him with helpful counsel had they not been denied all access to him. What emerges from these facts is a picture of law enforcement officers who were so anxious to extract a full and complete confession that they did everything within their power to keep this youthful suspect isolated and away from any adults who might interfere with their exploitation of "the awesome law enforcement machinery possessed by the State” (People v Cunningham, 49 NY2d 203, 207).
The majority finds no legal authorities that would forbid such conduct in the absence of some form of additional trickery or deception. I disagree. In an early line of cases, this Court held that a "denial of access to the defendant’s family [i]s germane, but in no wise controlling on the question of voluntariness” (People v Burd, 18 NY2d 832, 833; accord, People v Hocking, 15 NY2d 973; People v Taylor, 16 NY2d 1038). However, the categorical position represented by the line of cases on which the majority relies (see, majority opn, at 56) was long ago modified by important intervening precedent.
In People v Townsend (33 NY2d 37), the Court ordered suppression of a statement where the police had deliberately lied to a 17-year-old suspect’s mother to prevent her from knowing that he was even in police custody. Townsend is, admittedly, not directly supportive of defendant’s position here, since its holding rested on the Court’s conclusion that "it is impermissible for the police to use a confession * * * when, in the course of extracting [it], they have sealed off the most likely avenue by which the assistance of counsel may reach [the suspect] by means of deception and trickery” (id., at 41 *61 [emphasis supplied]) — a condition not present here. However, the subsequent decision in People v Bevilacqua (45 NY2d 508) clarified the Court’s position and, in the process, adopted a view that is directly relevant to the issue presented here.
In Bevilacqua, the police first obtained an oral confession despite the defendant’s repeated requests to speak to his mother. They then extracted a written confession after misleading the defendant’s attorney about his whereabouts. On the defendant’s appeal, this Court directed the suppression of both statements, including the oral one that had been obtained before the suspect’s attorney "entered the proceeding.” In so ruling, the Court noted that the defendant’s attorney might have "entered the proceeding” at an earlier point if the defendant’s request to see his mother had been honored (id., at 514). In words that are particularly instructive in this case, the Court specifically identified as "[c]rucial” "the continuing effort by the police to prevent defendant from establishing contact with anyone who might be able to provide him with assistance or advice” (id., at 514).
It is evident from both the result and the rationale in Bevilacqua that the holding was not limited to a situation in which the police use deliberate trickery and deceit, as the majority suggests (majority opn, at 56). Indeed, if a narrow rule based on the use of chicanery had been intended, there would have been no reason for the Court to suppress the defendant’s oral statement, which was made before the deceived attorney had even arrived. The narrow construction that the majority now gives to the Bevilacqua decision is also belied by the opinion in People v Casassa (49 NY2d 668, 681-682), in which the Court rejected a mentally ill defendant’s Bevilacqua claim but suggested that the outcome might well have been different if "the record supported the inference that the police intentionally deprived the defendant of access to his family in an effort to obtain a confession.” Once again, the Court’s focus was on the denial of access, not the use of trickery and falsehoods.
Two subsequent developments in the case law are also pertinent. People v Fuschino (59 NY2d 91, 100) established the principle that relief is unavailable if the police do not deprive a 19-year-old suspect of access to family members "in an effort to bar his exercise of his right to counsel and to obtain a confession” (accord, People v Winchell, 64 NY2d 826, cited in majority opn, at 56). And, People v Crimmins (64 NY2d 1072) *62 held, that the voluntariness of the confession of a "competent adult” who has not asked for an opportunity to speak with family members is not affected by the fact that the police have denied such family members access. Neither of these cases, however, addresses a problem such as the one presented here, where the detained suspect was a minor.
In this regard, the majority’s suggestion that the police "reasonably believed that they were dealing with an adult” (majority opn, at 56) is fallacious. Even assuming, as the police justifiably did,* that defendant was 16 at the time he was questioned, it cannot be said that he was actually an adult in any realistic sense of that term. To be sure, our statutes would permit him to be tried as if he were an adult for the serious crimes of which he had been accused (see, CPL 1.20 [42] [2]). Furthermore, under CPL 140.20 (6) and Family Court Act § 305.2, he could be arrested without immediate notice to his parent or guardian. None of these statutory provisions, however, negate the elemental fact that defendant was, at most, 16 years old and, under our State’s law, an infant for most purposes (see, e.g., CPLR 105 [j]; Civil Rights Law § 1-a; Correction Law § 2 [13]; Domestic Relations Law § 2; EPTL 1-2.9-a; Judiciary Law § 1-a; General Obligations Law § 1-202). As such, unlike the detainees in Crimmins and Fuschino, defendant had neither the maturity nor the experience to protect his own rights in the inherently coercive, police-dominated atmosphere in which he found himself. Thus, as was recognized in Bevilacqua, he should have been permitted to establish "contact” with the adults who were waiting outside to see him and "who might be able to provide him with assistance or advice” regarding the seriousness of the situation and the need for consultation with counsel before making statements that would irrevocably prejudice his legal position (see, People v Bevilacqua, supra, at 514).
Furthermore, there can have been no other reason for the decisions of Detective Taglioni and Assistant District Attorney Fairstein to prevent defendant’s aunt, "Big Brother” and mother from speaking to him other than to capitalize on his youth and isolation and to assure that he did not receive aid and advice from the supportive adults who were in a position *63 to retain counsel for him. Indeed, it is apparent that the authorities’ purpose was to obtain the evidence they wanted before permitting defendant to speak with an adult who might interfere with the investigators’ absolute control over his person and environment (see, People v Bevilacqua, supra, at 514). In other words, "the police intentionally deprived the defendant of access to his family in an effort to obtain a confession” (People v Casassa, supra, at 681-682).
Contrary to the majority’s assertion, the foregoing conclusion requires no impermissible inference drawing. Assistant District Attorney Fairstein made the authorities’ motives in this regard explicit when she told defendant’s mother that she would not be permitted to see her son until after the detectives were finished with their questioning. This declaration that defendant would continue to be isolated despite the presence of his mother at the police station belies the suggestions made earlier to Hatcher and Nocenti that the only reason they were being denied access was that neither was a parent or a person who had come to provide legal representation.
Finally, defendant’s need for an adult perspective in this situation is highlighted by the cynical manner in which the detectives manipulated the information they gave him in order to induce a confession. The detectives told defendant that he had been implicated in the crime by others but that it was possible that he could still be released "depending on what [he] ha[d] to tell [them].” When defendant balked, the officers told him, falsely, that they were able to lift fingerprints from the victim’s jogging pants. At that point, defendant, perceiving no alternative, acceded to the police pressure and began giving the inculpatory statements that had subsequently convicted him.
Manifestly, an experienced adult could have disabused defendant of the naive notion that there was anything he could say to police that would result in his release at this stage in the investigation. Certainly, a knowledgeable adult — or an attorney retained by such an adult — could have alerted him that he could not extricate himself from the most serious charges merely by denying having directly participated in the rape. In any event, defendant’s aunt, "Big Brother” or mother could have helped this 15-year-old suspect to appreciate the value of waiting until after he had spoken to an attorney before committing himself to the inculpatory statements he was in the process of making.
*64 In sum, other than an undisguised intention to exploit this defendant’s youthful vulnerability, there was no justification for the authorities’ actions in preventing defendant from gaining access to the helpful counsel of the supportive adults who had gathered at the police station to assist him. Accordingly, I would hold that the statements the police obtained as a result of their overreaching ought to have been suppressed. Such a holding is necessary, in my view, both to deter the abuse of police authority and to protect the right to counsel of those who are too young and naive to appreciate its importance. Because the analysis and holdings of the courts below, and of the majority here, fail to give adequate weight to the rights of this unrepresented juvenile, I dissent from the decision to uphold his conviction.
Chief Judge Kaye and Judges Simons, Hancock, Jr., and Levine concur with Judge Bellacosa; Judge Titone dissents in a separate opinion; Judge Smith taking no part.
Order affirmed.

 I do not dispute the majority’s conclusion that the police cannot be faulted for failing to accord the statutory protections of CPL 140.20 (6) or Family Court Act § 305.2 when the suspect has misrepresented his age and there is no objective basis for doubting the suspect’s false claim.